USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-2084 HUGH G. PILGRIM, Plaintiff, Appellant, v. THE TRUSTEES OF TUFTS COLLEGE, Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ____________________ Before Selya, Circuit Judge, Aldrich and Cyr, Senior Circuit Judges. ____________________ William F. Green with whom Robert A. Rossi was on brief for appellant. David C. Henderson with whom Victoria L. Botvin and Nutter, McClennen & Fish were on brief for appellees. ____________________ July 10, 1997 ____________________ ALDRICH, Senior Circuit Judge. Plaintiff Hugh G. Pilgrim ("Pilgrim") commenced this journey, pro se, with a 24 page complaint of employment discrimination containing 19 counts, his opponents being the Trustees of Tufts College ("Tufts")  and  several  named individuals. After a number of not now  relevant  steps he ended, with counsel, with 6 counts, some old, some new, and with Tufts as the sole adversary. At one time or another he faced the following procedures -- a motion to  dismiss;  multiple motions to strike; and defendant's motion for summary judgment. On his own part Pilgrim moved for summary judgment. In due course the court denied this, and granted all of Tufts' motions. We affirm. I. Background We take the facts favorably to plaintiff, or, if against  him,  if  not  rebutted. Pilgrim was an African-American, a native of Barbados. He had many qualifications, for which, in November 1987, he became employed as an environmental research analyst in Tufts Center for Environmental Management ("CEM"). In January of 1989 his promotion to Program Development Analyst brought him under the supervision of Kurt Fischer ("Fischer"), a white male. In April of 1990 Fischer gave Pilgrim an "inconsistent" performance rating. Despite Pilgrim's  request for the full account, Fischer did not supply it  until  July 30. The writing was even more negative than the oral review. Fischer required Pilgrim to sign for its receipt -2- without  any  opportunity  either to read or discuss. Under Tufts policy  Pilgrim should have been allowed to discuss a negative review  with  the  next  level of management, in this case, William Moomaw ("Moomaw") a director of CEM and Fischer's supervisor. Moomaw, however, refused to meet with Pilgrim. Beginning in June of 1990, Fischer began imposing disciplinary restrictions on Pilgrim. These included a requirement  that,  for  a  three week period, he submit daily logs recording all of his activities (including telephone calls in and  out,  and  all meetings held), and that he submit in advance abstracts  of  papers intended for publication or acceptance for presentation at conferences. He was also denied funding to attend professional conferences. Fischer imposed further disciplinary restrictions in September 1990, including reimplementation  of  the  daily log requirement and an order that Pilgrim cease participating in an ad hoc committee on race, justice and the environment. According to Pilgrim's affidavit, during the period Fischer supervised Pilgrim, he called him "space pilgrim," "lazy" and accused him of "shifting positions all the time." Pilgrim took these comments as racial slurs. On  September  24, 1990, Pilgrim initiated an internal grievance procedure alleging discrimination by Fischer. Pilgrim's claims were initially evaluated by Moomaw who subsequently informed Pilgrim by letter that there was no -3- evidence  of  discrimination by Fischer. Pilgrim proceeded with the grievance. A grievance committee (sometimes the "Committee") composed of three Tufts faculty members, was convened. We note, in passing, that in March of 1991, Dean Anthony Cortese ("Cortese") refused to provide Pilgrim with a reference to accompany his application for admission to a workshop. According to Pilgrim, Cortese told him that the refusal was based on the fact that Pilgrim had filed this grievance. In January of 1991, the Tufts Budget Department directed CEM to cut its payroll expenses by ten percent. Moomaw and two other directors decided to eliminate ten staff positions and to reconfigure others. As a result of these moves, Pilgrim's job was deemed superfluous. A few of the designated  employees  left voluntarily while the rest, including Pilgrim,  were scheduled for termination. On the advice of the Human  Resources  Department, however, Pilgrim was spared because of his pending grievance. The other employees (including an African-American woman who was rehired three months later), were terminated on June 10, 1991. On March 27, 1991, the Committee had forwarded the results of its investigation of Pilgrim's grievance to Jean Mayer ("Mayer"), then President of Tufts. When Pilgrim attempted to obtain a copy of the Committee's report, he was told  that  Mayer had determined that it was "classified." As a -4- result  of  the  Committee's recommendations, however, Fischer was relieved  of  all supervisory duties and Pilgrim began reporting to Moomaw. In July of 1991, six weeks after the new reporting relationship began, Moomaw gave Pilgrim an "inconsistent" performance  rating,  repeating criticisms made by Fischer a year earlier.   Also that summer, Pilgrim applied for a promotion to Executive  Director  of  the Sustainability Consortium, a position which was eventually given to a white female. On October 2, 1991, Pilgrim filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") claiming various acts of alleged racial and national origin discrimination on the part of Tufts. On October 31, he was notified that he would be terminated on December 31, and he amended his MCAD complaint to reflect the fact that he was being  "laid-off."   He  filed an amended complaint in this action on June 2, 1994, charging, inter alia, racial and national origin-based harassment, failure to promote, wrongful discharge,  and  retaliatory discharge1 in violation of Title VII 1. Not to by-pass anything, we recognize in a footnote, Pilgrim's retaliatory discharge claim, on the very difficult to make assumption that it was inferentially pleaded in his complaint to the MCAD. Even assuming that amending his MCAD complaint as to his "laid off" status was enough to encompass a claim of retaliatory discharge in this action, see Lattimore v. Polaroid Corp., 99 F.3d 456, 464 (1st Cir. 1996) (construing liberally pro se plaintiff's administrative complaint), it is precluded by the undisputed fact that Tufts was not notified of the MCAD complaint until more than two months after Pilgrim was notified of his termination, see -5- of  the  Civil  Rights  Act  of 1964, 42 U.S.C. S 2000e et seq., and pendent state discrimination claims brought under Mass. Gen. Laws ch. 151B, and the Massachusetts Civil Rights Act. II. Discussion Prior to any analysis of Pilgrim's substantive claims,  we  first  dispose  of several procedural grounds alleged. Pilgrim maintains that the court erred in striking certain exhibits and portions of his affidavits, wrongly disregarded his showing of a continuing violation which would have pushed back  the  barriers  of  the  statutes of limitation, and abused its discretion in refusing to admit the Committee's report, virtually the only piece of evidence presented in his opposition to summary judgment. We review seriatim. A. Motions to Strike Pilgrim appeals the allowance of Tufts' motion to strike 18 of 19 documents submitted in support of his motion for  summary  judgment2 and the partial striking of "incompetent hearsay" in the 19th document: his affidavit. One of the Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) (requiring a plaintiff to show knowledge of protected conduct by employer). 2. Although Pilgrim is not appealing the denial of his motion for summary judgment, he apparently subsequently resubmitted some or all of these previously stricken documents in conjunction with his opposition to Tufts' motion for summary judgment and now argues that they should have been considered as part of the court's analysis of that motion. -6- stricken documents was the report of the grievance committee, which we address separately, post. Without further explanation for the disallowance of these documents, we will assume that the court's basis for striking was the one stated in Tufts' motion, that the court had used to grant an earlier motion to strike: Pilgrim's failure to certify the documents in accordance with Fed. R. Civ. P. 56(e), or his failure to state an inability to do so. See  Fed.  R.  Civ. P. 56(f). Pilgrim makes no excuses, arguing, instead, that Tufts' motion to strike was untimely, coming after the 20 days allowed by Fed. R. Civ. P. 12(f). As Tufts points out, however, Rule 12(f) applies only to pleadings and has no applicability to motions made in pursuit of or in opposition to summary judgment. In  regard  to  Pilgrim's  affidavit, we are unsure which of  the  statements the court struck. However, we will consider statements Pilgrim alleges were made directly to him by Fischer, Cortese, Rebecca Flewellyn, Mayer's assistant, and Kathe Cronin, the Human Resource Director, as admissions by a party opponent under Fed. R. Evid. 801(d)(2). The alleged statement by Professor Gerard Gill, one of the members of the Committee,  to  Pilgrim  that "race was a factor in Kurt Fischer's treatment  of  [him]"  was  inadmissible hearsay against Tufts. We concur with the court that all other alleged statements were hearsay and therefore excludable. -7- -8- B. Continuing Violations As part of its motion to dismiss, Tufts sought to limit Pilgrim's Title VII and Chapter 151B claims to conduct occurring  outside  the  parameters set by the respective statutes of limitation. The court held that any conduct alleged to violate  Title VII that occurred before February 4, 1991 -- 240 days  prior  to  the  MCAD  complaint -- and any conduct relevant to his claim under Chapter 151B occurring before June 2, 1991 -- 180  days  prior to the MCAD complaint, could not be considered. See 42 U.S.C. S 2000e-5(e); 29 C.F.R. SS 1601.70(a), 1601.74(a); Mass. Gen. Laws ch. 151B S 9. To avoid the strictures of the limitations periods, Pilgrim contends that the periods should be extended due to a continuing violation. In the Title VII arena: [I]f a violation is of a continuing nature,  the  charge of discrimination filed with the appropriate agency may be timely as to all discriminatory acts encompassed by the violation so long as the charge is filed during the life of the violation or within the statutory period . . . which commences upon the violation's termination. Kassaye v. Bryant College, 999 F.2d 603, 606 (1st Cir. 1993). The same holds true of Chapter 151B. See Lynn Teachers Union v. Massachusetts Comm'n Against Discrim., 406 Mass. 515, 520 (1990). A continuing violation may be either serial or systemic.   La wton v. State Mut. Life Assur. Co., 101 F.3d 218, -9- 221  (1st  Cir. 1996). A systemic violation has its "roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint." Id.  at  222  (citing  Jensen v. Frank, 912 F.2d 517, 522 (1st Cir. 1990)). Pilgrim argues only for a serial violation. This is one "compris[ing] a number of discriminatory acts emanating from  the  same discriminatory animus, each of which constitutes a separate wrong actionable under Title VII." Id. at 221-22. The series must contain a specific beachhead violation occurring within the limitations period. Muniz-Cabrero v. Ruiz, 23 F.3d 607, 610 (1st Cir. 1994). Mere subsequent effects of earlier discriminatory action will not extend the limitations  period. Kassaye, 999 F.2d at 606. As a threshold requirement,  Pilgrim must identify at least one discriminatory act or practice occurring after February 4, 1991. Pilgrim maintains that Cortese's refusal of the letter  of  reference on March 1, 1991 and Moomaw's negative May 1991 review establish that beachhead. We disagree. Pilgrim has not shown either of these actions to constitute an actionable violation of Title VII or Chapter 151B. Pilgrim's affidavit testimony that Cortese told him he was denying the letter  of  reference because Pilgrim had filed a discrimination grievance is not of itself evidence of, nor an admission of racial  or  national  origin bias. Nor has Pilgrim identified any -10- evidence  that would lend an inference of illegal motivation to Moomaw's review. Thus, there is no continuing violation that would serve to extend the limitations period. C. Denial of Extension of Discovery Deadline On  April  24,  1995,  the  court set December 29, 1995 as the deadline for discovery. On December 11 Pilgrim noticed five Tufts employees, including Fischer and Moomaw, for depositions to be taken in mid-January 1996. On January 4, 1996,  Tufts  objected  to  the proposed depositions as being after the discovery deadline. On January 9, Pilgrim moved for an extension  of  the deadline that the court then denied. We will overturn  a  court's denial of a motion to extend discovery only for abuse of discretion. Coyante v. Puerto Rico Ports Auth., 105  F.3d  17,  22 (1st Cir. 1997). There is no such abuse here. Pilgrim acknowledges that his failure to ask for an extension prior to the deadline's expiration was an error in judgment. In the next breath, however, he accuses Tufts of delaying delivery of documents, without which he could not properly depose its employees. We cannot agree. First, Tufts did not, as Pilgrim implies,  delay in the delivery of these documents. The record reflects that an overly broad discovery order by Pilgrim resulted in a motion to quash and finally in a protection order. Second, Pilgrim's own brief tells us that these documents  were  delivered  on December 21, 1995, 10 days after he -11- noticed  the  depositions.  We fail to understand how Pilgrim can claim that he scheduled the depositions after receiving the documents and then admit that the documents came later. If there was any error here, it was Pilgrim's own. D. The Grievance Report3 Central to almost every substantive ground in Pilgrim's appeal is a report (the "Report") issued by the Committee  on  March 27, 1991. When Pilgrim attempted to submit it as part of his summary judgment motion, the court found it inadmissible as "a collection of multi-level hearsay statements."  We understand Pilgrim's distress at this ruling, the Report being his only hope of withstanding Tufts' motion for summary judgment. On appeal, as he did below, Pilgrim contends that the Report was not hearsay, but instead qualifies, inter alia, as an admission of a party opponent under Fed. R. Evid. 801(d)(2)(B), as an adoptive admission. Rule  801(d)(2)(B)  provides that "[a] statement is not hearsay  if  .  .  .  [the]  statement is offered against a party and is . . . a statement of which the party has manifested an adoption  or  belief  in  its truth . . . ." The burden of showing the manifestation is on the party offering the evidence. Cf. Riccardi  v.  Children's  Ho sp. Medical Ctr., 811 F.2d 18, 24 (1st 3. As we noted, ante, the Report was one of the documents earlier stricken for lack of certification. However, since the court ruled on its admissibility in its memoranda denying Pilgrim's motion for summary judgment, we assume this deficiency was repaired. -12- Cir. 1987). We have identified the correct approach where documents are concerned as asking whether "the surrounding circumstances tie the possessor and the document together in some  meaningful  way."   Un ited States v. Paulino, 13 F.3d 20, 24 (1st Cir. 1994). We believe that Pilgrim has carried his burden,  at  least  to  an  extent. The question is to what extent? The  answer  is: to the extent that the adoptive party accepted and acted upon the evidence. "Adoption or acquiescence may be manifested in any appropriate manner." Fed. Rules of Evid., Advisory Committee Notes. The Committee was convened under Tufts' established grievance procedures, and its recommendations given to Mayer. The major ones were that Fischer be relieved from all supervisory  responsibilities, that Pilgrim, instead, report to Moomaw, and that an independent overseer outside of CEM be appointed to monitor the new reporting relationship. Tufts does not dispute that Mayer implemented all three of these recommendations. In particular, removing Fischer  from  all  supervisory duties was a serious enough action that  we  cannot  but  think  that Mayer would not have carried this out unless he accepted the Report's conclusions as the truth. As such, his acceptance of the contents of the Report and his implementation of its recommendations, without disclaimer, served as an adoption of the Report for the purposes of Rule 801(D)(2)(B). We note, however, that while the Report was -13- generated during the limitations period, most of its contents detail conduct that occurred prior to that period, and hence barred  from  consideration. We will, nevertheless, discuss it. In  essence,  the Committee concluded that Fischer had failed  to  give Pilgrim a fair and impartial review and that he had  exaggerated  complaints about Pilgrim's performance in order to justify an "apparent desire . . . to terminate [him]." It also stated a finding that "Pilgrim appears to have been singled  out  for  certain  types of disciplinary actions." On the question of racial and national origin discrimination it stated: [N]o  substantive evidence that Mr. Fischer intended to discriminate against Mr. Pilgrim on the basis of race, color, [or] national  origin . . . although Mr. Fischer could have been motivated by prejudices against Mr. Pilgrim. It is plausible to the Committee that Mr. Fischer's actions were motivated by other factors, such as personality conflicts. However, the Committee could not fully evaluate this component  of  the grievance, as performance reviews of other CEM personnel supervised by Fischer could not be obtained. Therefore,  the Committee could not compare Mr. Fischer's decisions with respect to performance ratings and salary increases. Nonetheless, the Committee finds that several  of  Mr. Fischer's actions . . . did result  in  the perception of discrimination by Mr. Pilgrim. Such restrictions could have had discriminatory impacts to the extent that Mr. Pilgrim was in several instances treated differently from other professional staff at CEM. Having  determined that this finding, along with party opponent admissions from Pilgrim's affidavit, compose all of Pilgrim's -14- evidence,  we  turn  next  to the court's grant of summary judgment to Tufts. E. Summary Judgment We review grants of summary judgment de novo, indulging,  as  must  the  court below, in all inferences favorable to  the  non-moving  party.  Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996). Summary judgment is appropriate only when the record, viewed in this favorable light, produces no genuine issue of material fact, thereby entitling the moving party to a judgment as a matter of law. Fed. R. Civ. P. 56(c). This standard is applicable even in employment  discrimination cases "where elusive concepts such as motive or intent are at issue . . . if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Lehman, 74 F.3d at 327 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). The bare fact is that Pilgrim failed  to  present evidence of the quality and type adequate to stave off summary judgment within the context of the familiar McDonnell-Douglas framework for discrimination claims. See McDonnell  Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); Lattimore  v.  Polaroid Corp., 99 F.3d 456, 465 (1st Cir. 1996). Pilgrim's  perception is not evidence. The Report's deficiency we  have  already referred to. As we noted, ante, the Report is the  cornerstone upon which Pilgrim attempts to build his case. -15- But a close reading of the Committee's conclusions fails to provide the required inference of bias behind Tufts' actions. Read  closely  in  the  light most favorable to Pilgrim, the Report concludes that the restrictions placed on him resulted in Pilgrim being treated "differently from other professional staff." In the same breath, the Committee reported that they were unable to find any "substantive evidence that Fischer intended  to  discriminate against Pilgrim on the basis of race, color [or] national origin . . . and that [i]t is plausible that Mr. Fischer's actions were motivated by other factors, such as personality conflicts." The  only  inference  that  can be drawn here is that for whatever  reason  Pilgrim  received "different" treatment, it was as likely due to a clash of personalities as anything else. And although the Committee found that Fischer's behavior left Pilgrim  with  the perception he had been discriminated against, Pilgrim's perception is not enough to withstand summary judgment. The relevant inquiry here is the intent of the defendant which the Committee was unable to define. Nor do any of statements in Pilgrim's affidavit alleged to have been made by the defendant's employees lend assistance to this uphill battle. These statements, for the most  part,  serve  to  show  that Pilgrim was told by certain Tufts employees, first, that he would receive a copy of the Report, and  later  by  those  same  employees, that he would not be able to -16- obtain a copy because it was "classified." The inference Pilgrim would like us to draw from this -- that he was initially denied access to the Report because Tufts feared it would be damaging -- is belied by the actual contents. Cortese's alleged comment that he would not provide a reference for a workshop Pilgrim wanted to attend because Pilgrim "filed a discrimination grievance against CEM with Tufts," as we observed, ante, does not disclose the actuating motive. As is the case with virtually all of Pilgrim's evidence, it can be construed as supporting the fact that Pilgrim  was  treated  differently, however, it does not show that this treatment resulted from any racial or national origin bias. To avoid summary judgment Pilgrim must, at the very least, present a single piece of evidence that would allow a reasonable juror to infer this bias. He has not done so; accordingly,  his claims must fail. The orders of the district court are Affirmed. -17-