United States Court of Appeals
For the First Circuit For the First Circuit


No. 96-2050

VINCENT DeNOVELLIS,

Plaintiff, Appellant,

v.

DONNA E. SHALALA, SECRETARY OF HEALTH AND HUMAN SERVICES,

Defendant, Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge] 



Before

Boudin, Circuit Judge, 

Bownes, Senior Circuit Judge, 

and Stahl, Circuit Judge. 



Jodie Grossman, with whom ALEF, Inc., was on brief for appellant. 
George B. Henderson, II, Assistant United States Attorney, with 
whom Donald K. Stern, United States Attorney, was on brief for 
appellee.



September 2, 1997


BOWNES, Senior Circuit Judge. Plaintiff Vincent BOWNES, Senior Circuit Judge. 

DeNovellis brought this action alleging employment

discrimination under Title VII of the Civil Rights Act of

1964, 42 U.S.C. 2000e et seq., and under the Age 

Discrimination in Employment Act (ADEA), 29 U.S.C. 621 et 

seq., against his employer, the Secretary of the United 

States Department of Health and Human Services (HHS). He

alleged that he was discriminated against on the basis of his

race, national origin, and age, in his work assignments, in

denials of promotions and awards, and in being subjected to a

hostile work environment. The district court granted summary

judgment to the defendant. We affirm.

I.

A. Facts 

Viewed in the light most favorable to the nonmoving

party (DeNovellis) and drawing all reasonable inferences in

his favor, the following facts are treated as undisputed for

purposes of the motion for summary judgment. DeNovellis is a

white male of Italian descent. He was sixty-six years old at

the time he filed this action in 1994. 

From 1979 to 1991 DeNovellis served as Deputy

Regional Administrator (DRA) of the Boston Regional Office of

Human Development Services (HDS), which was part of HHS.

DeNovellis's position was eliminated in an agency

reorganization that occurred in the spring of 1991. After

-2- 2

some months "in limbo," in the form of temporary assignments

to "meaningless" positions, DeNovellis became the program

manager of the Aid to Families with Dependent Children (AFDC)

program within the recently formed Administration for

Children and Families (ACF). His civil service grade

remained the same: GS-14. 

Until the reorganization, DeNovellis's supervisor,

A. Kenton Williams, was the Regional Administrator (RA) of

HDS. Williams was a black male of the age of fifty-five when

this action was filed. There were racial tensions in the

office. Williams often spoke out against the "insidious

racism that exists in our society," and, according to

DeNovellis, "would try to justify the behavior and reactions

of black staff persons, who having been subjected to racial

discrimination over the years, reacted differently under

certain circumstances." Williams also wrote a letter to the

editor of the Boston Globe commenting on the "tremendous 

pressures" faced by black executives. These comments about

the inequities suffered by blacks made DeNovellis feel

uncomfortable. 

There were also ethnic and race-related comments

around the office that Williams condoned. Members of the

staff would say things like "Vinnie, why don't you have your

people (Mafia) in the North End take care of them." (The

North End is a largely Italian neighborhood of Boston.) Both

-3- 3

Williams and a black friend of his, St. Clair Phillips, made

negative comments about DeNovellis's ethnicity. And staff

members made general references to "you whites" in Williams's

presence.

Williams and DeNovellis also had work-related

conflicts. Part of DeNovellis's job as DRA was to take

charge of the regional activities during the RA's absence.

Williams was often absent from the office and became

concerned that DeNovellis was signing so much correspondence

on Williams's behalf that it would highlight the frequency of

his absences. For this reason, Williams ordered DeNovellis

in 1989 to stop signing letters on his behalf.

In 1989 and 1990, other government administrators,

including Williams's supervisor in Washington, Pamela

Coughlin, who was white, told Williams that DeNovellis was

spreading negative comments about Williams. On more than one

occasion, Williams also had to intervene in heated disputes

that DeNovellis had with other people in the office. One

such incident pertained to the distribution of space, and

another concerned whether a minority student (who did not

report to DeNovellis) had been absent from work.

In 1990, certain federal employees were given the

opportunity to choose early retirement. DeNovellis was

eligible to retire but rejected the offer. Several people,

-4- 4

including Williams and two of his black friends, urged

DeNovellis to take this opportunity and retire.

The heart of DeNovellis's complaint is an

assignment to a temporary "detail" to an "unestablished

position" in the Office of Fiscal Operations (OFO) in October

1990. Williams claims he was instructed to order this

reassignment by Coughlin, his (white) supervisor.

Nevertheless, Williams now admits that the detail was "a

sham," and was concocted in part because Williams did not

want DeNovellis to be his deputy. On October 9, 1990,

Williams removed DeNovellis from the order of succession to

act as RA.

DeNovellis suffered no diminution in grade, pay, or

benefits during the detail. He worked under the supervision

of Williams's friend, St. Clair Phillips, who was black.

Officially, DeNovellis was responsible for financial

activities, for which he had no training or capability. For

the first month and a half, he "performed the same (DRA)

duties under a new supervisor." In mid-November, the new

supervisor, Phillips, asked Williams to end the detail

because DeNovellis did not have the background to perform the

OFO work and he was refusing to perform his old DRA duties.

Williams refused. The detail was due to expire in February

1991 but, upon Williams's request, was extended through March

31, 1991. 

-5- 5

On March 8, 1991, DeNovellis filed an EEO

complaint, alleging age, race, and national origin

discrimination in assignment of duties, awards, and

reassignment. On April 11, three days after the EEO officer

interviewed Williams, Williams filed forms requesting that

DeNovellis's position be switched with that of Paul Kelley, a

black male who was a friend of Williams's and who was a

supervisory accountant in OFO. According to DeNovellis,

Williams's purpose in making this request was to protect the

grades of Phillips and Kelley, both black and both friends of

his, in an impending classification review. However, the

classification review and the proposed "job swap" were never

carried out, overtaken by the agency's restructuring in the

spring of 1991.

Around the same time that DeNovellis's initial

detail expired at the end of March 1991, HHS underwent an

internal restructuring. The former HDS and another sub-

agency of HHS, the Family Support Administration, were merged

into a new entity, the Administration for Children and

Families (ACF). The restructuring took several months to

effectuate. During the transition, DeNovellis maintained his

title of DRA of HDS and carried out some tasks of the Deputy

position, but he received no official assignments; as before,

people came to him for information. 

-6- 6

In April or May 1991, Hugh Galligan, a white male,

was appointed Acting Regional Administrator of the new ACF;

he appointed Williams as his Deputy. By May, Williams was no

longer in charge of the Boston office. The appointments of

Galligan and Williams were finalized on August 23, 1991. Two

days later, DeNovellis's position was "realigned"; his

official title remained DRA of HDS (even though HDS was

phasing out) but this was now within the new ACF. The result

was that Williams was DRA of ACF, and DeNovellis retained the

job title "DRA" but remained unassigned in the new agency.

His grade remained unchanged throughout this period.

In December 1991 Williams left Boston for a

position in Washington, D.C. Galligan then transferred

Phillips, who had been the head of OFO of the new agency, to

the DRA position at the new agency. Because Phillips was a

GS-15 and the new DRA opening was a GS-15, Galligan could

transfer Phillips laterally into the position without a

competitive search. Since DeNovellis was a GS-14, he could

not have been promoted to Williams's former position unless a

job vacancy announcement had been made and a competitive

search performed. There is no evidence that Galligan was

precluded from instituting such a search and considering

DeNovellis for the position.

In May 1992 DeNovellis was reassigned from DRA of

the Office of Family Security (OFS) in the new agency, to a

-7- 7

supervisory position as program manager in the same OFS.

This was not part of the management team of the new agency.

DeNovellis was the last person appointed to a permanent

position in the new agency. Galligan has since detailed him

twice to the OFO as an assistant goal leader for ongoing

restructuring. (Thus, in some respects, DeNovellis claims

his job assignments have been inappropriate because they were

beneath his DRA status and in other respects inappropriate

because the positions required accounting or financial

qualifications which he did not possess.)

According to DeNovellis, at least part of the

reason for the delay in his reassignment in the new agency

was a "position paper" he wrote in early 1992. The paper

pointed out the "convoluted interactions that were going on,"

and it accidently was mailed to a lot of people in the

region, creating a furor. Galligan was asked to find out who

was responsible for this position paper. During the

investigation, DeNovellis's computer was confiscated.

B. 

District Court Proceedings 

The district court granted summary judgment to the

Secretary as to all claims. It dealt separately with each of

the four types of adverse action alleged by DeNovellis. The

court relied on Landgraf v. USI Film Prods., 511 U.S. 244 

(1994), to reject the Title VII claim for deprivation of

-8- 8

duties that occurred prior to November 21, 1991, the

effective date of the Civil Rights Act of 1991, 42 U.S.C. 

1981a ("the Act" or "the 1991 Act"). The court concluded,

essentially, that even if DeNovellis was discriminated

against, he was not entitled to any remedy for it. The

equitable remedies available under Title VII prior to the

1991 Act were not appropriate because he suffered no loss in

pay or loss of job that would warrant back pay or

reinstatement (he did not seek reinstatement). And the new

remedies made available under the 1991 Act (in particular,

compensatory damages) are only available for acts which took

place after November 21, 1991, and therefore did not apply to

DeNovellis's claims of pre-Act discrimination.1

The district court rejected DeNovellis's claim of

post-Act deprivation of duties based on his failure to

present sufficient evidence to enable a reasonable trier of

fact to conclude that the employer's motive for such

deprivation was discriminatory. Whereas DeNovellis provided

indirect evidence that Williams might have been motivated by

improper reasons in making pre-Act assignments, Williams was

no longer in charge of the Boston office after May 1991 and

he left Boston altogether in December 1991. The court held

that DeNovellis could not bootstrap the pre-May 1991 alleged

 

1. The court also concluded that such remedies were not
available under the ADEA as a matter of law, and DeNovellis
has not appealed that ruling.

-9- 9

discrimination by Williams into sufficient evidence for a

reasonable trier of fact to conclude that post-November 1991

decisions were animated by similar illegal bias. 

DeNovellis also made a claim of hostile work

environment based on negative comments about his ethnic

background coupled with his "sham detail." The district

court rejected this claim for essentially the same reasons it

rejected the deprivation of duties claims: any pre-Act

violation was a wrong without a remedy based on Landgraf, and 

there was insufficient evidence that any post-Act

discrimination had occurred. The court stated in one

sentence an alternative ground for its ruling: failure to

exhaust administrative remedies.2

The district court also granted summary judgment to

the Secretary on DeNovellis's claim that his computer was

confiscated in retaliation for filing an EEO complaint. The

court rejected this claim under Title VII on the ground that

DeNovellis failed to exhaust his administrative remedies,

because his EEO complaint alleged nothing about retaliation.

The court rejected the retaliation claim under ADEA on the

merits (the government had waived exhaustion as to ADEA).

The court concluded that DeNovellis failed to present any

 

2. DeNovellis also presented to the district court a claim
that he was denied the opportunity to be considered for
promotion to the DRA position in the new agency (ACF) after
Williams vacated it in December 1991. He does not pursue
this claim on appeal. 

-10- 10

evidence to establish a causal connection between his March

1991 age discrimination complaint against Williams and the

February 1992 confiscation of his computer by Galligan.

DeNovellis does not appeal this conclusion.

DeNovellis pursues three arguments on appeal:

(1) that he is entitled to the remedies delineated in the

Civil Rights Act of 1991 because his pre-Act and post-Act

deprivation of duties were part of one continuing violation

and the effects of his "employment purgatory" extended beyond

the effective date of the Act; (2) that the district court

erred in requiring him to exhaust his administrative remedies

as to post-detail deprivations of duties and hostile work

environment; (3) that the district court was obliged to

provide him with a declaratory judgment and/or an award of

attorney's fees.

II.

Standard of Review 

We review grants of summary judgment de novo.

Dubois v. United States Dep't of Agriculture, 102 F.3d 1273, 

1283 (1st Cir. 1996), cert. denied, 117 S. Ct. 2510 (1997). 

Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the

-11- 11

moving party is entitled to a judgment as a matter of law."3

Fed. R. Civ. P. 56(c).

"The very mission of the summary judgment procedure

is to pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial." Fed. R.

Civ. P. 56(e) advisory committee's note to 1963 Amendment.

The moving party "bears the initial responsibility of

informing the district court of the basis for its motion, and

identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact."

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the 

moving party has properly supported her motion for summary

judgment, the burden shifts to the nonmoving party, with

respect to each issue on which he has the burden of proof, to

demonstrate that a trier of fact reasonably could find in his

favor. Id. at 322-25. At this stage, the nonmoving party 

"may not rest upon mere allegation or denials of [the

movant's] pleading, but must set forth specific facts showing

that there is a genuine issue" of material fact as to each

issue upon which he would bear the ultimate burden of proof

 

3. A factual dispute is material if it has the potential to
affect the outcome of the litigation under the applicable
law; it is genuine if there is evidence sufficient to support
rational resolution of the point in favor of the nonmoving
party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 
248 (1986).

-12- 12

at trial. Anderson, 477 U.S. at 256; see Celotex, 477 U.S. 

at 321-23.

Like the district court, in deciding a summary

judgment motion we are obliged to view the facts in the light

most favorable to the nonmoving party, drawing all reasonable

inferences in that party's favor. Dubois, 102 F.3d at 1284. 

The test is whether, as to each essential element, there is

"sufficient evidence favoring the nonmoving party for a jury

to return a verdict for that party. If the evidence is

merely colorable or is not significantly probative, summary

judgment may be granted." Anderson, 477 U.S. at 249-50 

(citation omitted). 

Summary judgment is not "automatically preclude[d]"

even in cases where elusive concepts such as motive or intent

are at issue. Valles Velazquez v. Chardon, 736 F.2d 831, 833 

(1st Cir. 1984). "[I]f the non-moving party rests merely

upon conclusory allegations, improbable inferences, and

unsupported speculation," summary judgment may be appropriate

even where intent is an issue. Smith v. Stratus Computer, 

Inc., 40 F.3d 11, 12 (1st Cir. 1994) (internal quotation 

marks omitted). Where, however, the nonmoving party has

produced more than that, trial courts should "use restraint

in granting summary judgment" where discriminatory animus is

in issue. Valles Velazquez, 736 F.2d at 833; see 

Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 

-13- 13

922, 928 (1st Cir. 1983) (courts are "particularly cautious"

about granting summary judgment in such cases).

III.

Landgraf and the Continuing Violation Issue 

The district court granted summary judgment to the

government as to pre-Act deprivation of duties. The court

correctly found that the five-month assignment of DeNovellis

to a financial position for which he had no background and

the concomitant deprivation of meaningful duties constituted

an adverse employment action within the meaning of Title VII.

See Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) 

(holding that "tak[ing] something of consequence from the

employee," including "divesting her of significant

responsibilities," constitutes an adverse employment action);

see also Collins v. Illinois, 830 F.2d 692, 704 (7th Cir. 

1987). The court also found that there was sufficient

evidence in the record to create a factual dispute as to

whether the sham detail and the deprivation of duties were

motivated by illegal discrimination on Williams's part or by

race-neutral (and therefore not violative of Title VII)

personality conflict or cronyism. The court held that,

although DeNovellis would have a triable issue as to

liability for pre-Act discrimination, he had no right to a

remedy under the law as it existed prior to the 1991 Act.

-14- 14

Prior to enactment of the Civil Rights Act of 1991,

plaintiffs in Title VII cases were limited to equitable

remedies (including back pay, reinstatement, and injunctive

relief). Landgraf v. USI Film Prods., 511 U.S. 244, 252 

(1994). The Act, which became effective on November 21,

1991, amended Title VII, and "effect[ed] a major expansion in

the relief available to victims of employment

discrimination." Landgraf, 511 U.S. at 254-55. The 1991 Act 

created a right on the part of individuals alleging

intentional unlawful discrimination to recover compensatory

damages "for future pecuniary losses, emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment

of life, and other nonpecuniary losses," as well as punitive

damages. 42 U.S.C. 1981a(a)(1) & (b)(3) (1994); see 

Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 437 

(1st Cir. 1997). The Act also gave Title VII plaintiffs the

right to a jury trial in cases where they seek compensatory

or punitive damages. 42 U.S.C. 1981a(c). These new

provisions, however, do not apply to conduct that occurred

before the effective date of the Act, November 21, 1991.

Landgraf, 511 U.S. at 247, 286. 

Applying Landgraf to the instant case, the district 

court concluded that, even if DeNovellis were to establish

after trial that his sham detail and employment "purgatory"

violated his rights under Title VII, he would not be entitled

-15- 15

to any remedy. This is because the sham detail ended in

March 1991, prior to the effective date of the 1991 Act.

Therefore, even if liability were found after trial as to

that detail, the only remedies that would have been available

to DeNovellis were equitable, such as reinstatement, back

pay, or an injunction. As the district court analyzed the

remedies for pre-Act conduct: because DeNovellis "suffered

no loss of pay, he may not recover back pay; because he did

not quit his job, he does not seek reinstatement. There is

no possibility of enjoining Williams from future details

because he is no longer in the office, and DeNovellis does

not seek an injunction against details by Galligan. In

short, the five-month detail ending in the spring of 1991, if

based upon illegal discrimination, was a wrong without a

remedy." As to the post-Act deprivation of duties, the

district court found insufficient evidence to create a

triable issue as to discriminatory intent. DeNovellis does

not directly appeal the latter determination.

Instead, DeNovellis takes issue with both rulings,

pre-Act and post-Act, by essentially conflating the two.

DeNovellis argues that he was the victim of a continuing

violation that began before November 21, 1991, and continued

thereafter, entitling him to compensatory damages under the

1991 Act. A related continuing violation argument has been

applied to other time requirements imposed by the

-16- 16

antidiscrimination laws,4 but the theory on which DeNovellis

bases his argument is not one that the courts have approved.

We have delineated two types of continuing

violation cases: systemic and serial. Pilgrim v. Trustees 

of Tufts College, 118 F.3d 864, , 1997 WL 370286, at *3 

(1st Cir. 1997); see Barbara Lindemann & Paul Grossman, 

Employment Discrimination Law 1351-63 (3d ed. 1996). A 

systemic violation usually "has its roots in a discriminatory

policy or practice; so long as the policy or practice itself

continues into the limitation period, a challenger may be

deemed to have filed a timely complaint," even if he fails to

show "an identifiable discrete act of discrimination

transpiring within the period." Jensen v. Frank, 912 F.2d 

517, 523 (1st Cir. 1990).

DeNovellis does not argue that there was a systemic

violation here. Rather, he argues (A) that a serial

violation occurred; (B) that the continuing effects of his

pre-Act deprivation of duties constituted a continuing

violation; and (C) that he was subjected to a continuing

hostile work environment. We will address each of these

arguments in turn.

 

4. The issue usually arises in the context of a statute of
limitations challenge. See, e.g., United Airlines, Inc. v. 
Evans, 431 U.S. 553 (1977). But a continuing violation 
theory could be applied to any time requirement imposed by
Title VII, whether it be the effective date of an amending
statute, as here, or a statute of limitations, as in Evans. 

-17- 17

A. Serial Violation 

A serial violation "is composed of a number of

discriminatory acts emanating from the same discriminatory

animus, each act constituting a separate wrong actionable

under Title VII." Jensen, 912 F.2d at 522; Mack v. Great 

Atl. & Pac. Tea Co., 871 F.2d 179, 183 (1st Cir. 1989). To 

state a claim under this type of continuing violation,

DeNovellis would have to show that at least one actionable

violation occurred within the relevant time period, even

though the series had begun prior to November 21, 1991. See 

id.; Pilgrim, 118 F.3d at , 1997 WL 370286, at *3. He 

could then be awarded the remedies made available in the 1991

Act. Cf. Sabree v. United Bhd. of Carpenters & Joiners, 921 

F.2d 396, 401 (1st Cir. 1990) (In a continuing violation

case, back pay remedy "may be based on acts that occurred

prior to the limitations period when a violation has been

established by an act within the period."). We must ask,

therefore, whether DeNovellis's post-Act deprivation of

duties constituted one or more separate violations of Title

VII. To show an actionable violation, DeNovellis would have

to satisfy the familiar three-step McDonnell Douglas 

framework for analyzing discrimination claims. See McDonnell 

Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); 

Lattimore v. Polaroid Corp., 99 F.3d 456, 465 (1st Cir. 

1996). Of critical importance here, he would have to offer

-18- 18

facts, at an evidentiary level sufficient to withstand a

motion for summary judgment, showing that the alleged adverse

employment action was motivated by discrimination on the

basis of his race, national origin, or age (for an ADEA

violation). See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 

502, 511 (1993); Texas Dep't of Community Affairs v. Burdine, 

450 U.S. 248, 253 (1981) ("The ultimate burden of persuading

the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with

the plaintiff"). Of course, direct evidence of

discriminatory intent is often hard to come by, and

circumstantial evidence is often the only means of proving

such intent. See United States Postal Serv. Bd. of Governors 

v. Aikens, 460 U.S. 711, 716 (1983); Lindemann & Grossman, 

supra, at 11. As the Court noted in Hicks, DeNovellis may 

show discriminatory motive by circumstantial means: "The

factfinder's disbelief of the reasons put forward by the

defendant (particularly if disbelief is accompanied by a

suspicion of mendacity) may, together with the elements of

the prima facie case, suffice to show intentional

discrimination. Thus, rejection of the defendant's proffered

reasons will permit [but not require] the trier of fact to 

infer the ultimate fact of intentional discrimination, and,

. . . upon such rejection, no additional proof of

discrimination is required." Hicks, 509 U.S. at 511 

-19- 19

(footnote and internal quotation marks omitted); see also 

Burdine, 450 U.S. at 256 (plaintiff may succeed either 

directly or "indirectly by showing that the employer's

proffered explanation is unworthy of credence."). 

"[A]t the summary judgment stage the judge's

function is not himself [or herself] to weigh the evidence

and determine the truth of the matter but to determine

whether there is a genuine issue for trial." Anderson, 477 

U.S. at 249. The district court found that DeNovellis failed

to offer sufficient evidence, direct or circumstantial, to

meet his burden, even at the summary judgment stage of the

litigation, of providing substantive evidence that

discrimination was a factor in his post-Act deprivation of

duties. 

DeNovellis does not seriously contest that finding

on appeal. Nor could he: the record in this case presents

qualitatively different scenarios for the pre-Act and the

post-Act periods. The district court correctly found that

there was enough evidence of possible discriminatory animus

between Williams and DeNovellis that a jury could find the

pre-Act detail was motivated by discrimination and not mere

personality differences or cronyism. But once that detail

ended and Williams was no longer in charge of the Regional

Office, the reasons for DeNovellis's assignments were neither

analogous nor part of the same pattern or series. There is

-20- 20

precious little evidence or inference to get to a trier of

fact on discriminatory motive for post-Act employment

decisions. Of course, discrimination is not precluded merely

because Williams was no longer in charge. Nor does the fact

that Galligan is white insulate the defendant from a charge

that Galligan's actions were motivated by race. After all,

for the first eight months of Galligan's tenure as RA,

Williams was Galligan's deputy. Galligan, as the new person

in the office, might very well have given great weight to

Williams's allegedly biased recommendations about

reassignment of subordinate personnel during the

reorganization, transition, and realignments. But DeNovellis

presented no evidence of such discriminatory taint, either

directly or by inference. 

Indeed, there is evidence to the contrary.

Bureaucratic delays arising from the reorganization, which

indisputably had nothing to do with DeNovellis or with

invidious characteristics, overtook DeNovellis's personal

situation. Further, at his deposition, DeNovellis denied

that any of Galligan's actions were motivated by invidious

discrimination in any decision affecting DeNovellis's

employment. And DeNovellis himself attributed a significant

part of the delay in assigning him to a permanent position in

the new agency to his own error in judgment: the "position

paper" that he wrote and widely disseminated. The district

-21- 21

court correctly concluded that the record in this case

contains virtually no evidence of post-Act violations.

Therefore, DeNovellis cannot rely on a serial violation

theory to defeat the Secretary's motion for summary judgment.

B. Continuing Effects 

DeNovellis also argues another theory to circumvent

Landgraf: that the pre-Act sham assignment constituted a 

continuing violation through its continuing effects.

Although the assignment itself was a discrete action that was

over and done with before November 21, 1991, DeNovellis

emphasizes that its effects continued into the post-Act 

period. According to DeNovellis, these post-Act effects turn

the pre-Act discrimination into a continuing violation that

continued post-Act, thereby triggering the 1991 Act's

remedies. But continuing effects, without additional post-

Act discriminatory actions, do not turn a discrete pre-Act

decision into a continuing violation. See United Air Lines, 

Inc. v. Evans, 431 U.S. 553, 558 (1977). 

At one time, it was thought that this "continuing

effects" theory described a viable third type of continuing

violation case, in addition to systemic and serial

violations. But the Court has made it clear that the focus

of the inquiry in continuing violation cases should be on

"whether any present violation exists," not whether there are

residual effects of past discriminatory conduct to which the

-22- 22

statute does not apply. Id. (holding that a discriminatory 

act, not merely the effects of a past discriminatory act, 

must occur within the statute of limitations period of Title

VII); see Delaware State College v. Ricks, 449 U.S. 250, 258 

(1980); Sabree, 921 F.2d at 400. "[A] court evaluating a 

'continuing violation' argument must distinguish between a

continuing violation and the continuing effects of a prior,

yet discrete and no longer existent, discriminatory act."5

Cajigas v. Banco de Ponce, 741 F.2d 464, 469 (1st Cir. 1984); 

see Pilgrim, slip op. at 9; Kassaye v. Bryant College, 999 

F.2d 603, 606 (1st Cir. 1993). 

We recently rejected a plaintiff's theory that the

failure to restore her to her prior position formed part of a

continuous chain of misconduct extending beyond the time

deadline. Morrison, 108 F.3d at 443. We held that the 

employer's "inaction [was] not enough." Id. We pointed to 

 

5. We note that this is a rule governing what kind of
conduct creates liability, not a rule of evidence. Past acts
of discrimination may constitute relevant background evidence
and therefore may be admissible at trial. See Evans, 431 
U.S. at 558; Sabree, 921 F.2d at 400 n.9, 402.  

Moreover, although not considered in determining
liability, the continuing effects of discriminatory conduct
are considered at the relief stage if liability is found.
"The objective of fashioning an appropriate remedy in Title
VII cases is to formulate the most complete relief possible
to eliminate the effects of discrimination." Sabree, 921 
F.2d at 401 (internal quotation marks omitted); see Albemarle 
Paper Co. v. Moody, 422 U.S. 405, 418-21 (1975) (To the 
extent consistent with statutory limitations, once a
violation of Title VII has been found, it is important for
courts to fashion "make whole" relief.). 

-23- 23

what we had said in a somewhat analogous situation: "'it was

incumbent upon [the plaintiff] to allege facts giving some

indication that the later refusals were themselves separate

. . . violations.'" Valles Velazquez, 736 F.2d at 833 

(quoting Goldman v. Sears, Roebuck & Co., 607 F.2d 1014, 1018 

(1st Cir. 1979)). The same reasoning applies to the instant

case. Even though DeNovellis's sham detail had not been

remedied by the time the Act became effective, the focus at

the liability stage of our inquiry is the date the employer

made the allegedly discriminatory decision to detail him,

even though the decision's effects still persisted after that

effective date. See De Leon Otero v. Rubero, 820 F.2d 18, 20 

(1st Cir. 1987) (Defendants' refusal to reinstate plaintiff

"was not a separate act of discrimination, but rather a

consequence of his initial demotion."); Valles Velasquez, 736 

F.2d at 833 (demotion followed by defendant's repeated

refusals to reinstate plaintiff did not constitute a

continuing violation); Goldman, 607 F.2d at 1018-19 (denial 

of requests to be retransferred back to original department

after allegedly discriminatory initial transfer did not

constitute a continuing violation). We conclude that

DeNovellis's continuing effects argument is legally

insufficient.

C. Hostile Work Environment 

-24- 24

As his final salvo against the Landgraf bulwark, 

DeNovellis argues a theory of hostile work environment which

would constitute a continuing violation of Title VII.6 See 

Mills v. Amoco Performance Prods., Inc., 872 F. Supp. 975, 

986 (S.D. Ga. 1994) (A "hostile environment sexual harassment

claim is an archetypal continuing violation claim."). He

cites cases involving sexual harassment where courts have

concluded that the allegations "were not discrete and

independent acts of sexual harassment . . . but additional

components of one cause of action for an alleged sexually

hostile environment." Mills, 872 F. Supp. at 985. "A 

hostile environment claim is a single cause of action rather

than a sum total of a number of mutually distinct causes of

 

6. The government argues that DeNovellis cannot raise this
hostile work environment argument here because he failed to
allege it in his complaint. That view misconstrues the
purpose of the complaint in federal litigation. Under the
concept of notice pleading, a complaint need not clearly
articulate the precise legal theories upon which the
plaintiff bases his right to recovery. The complaint must
simply "'give the defendant fair notice of what the
plaintiff's claim is and the grounds upon which it rests.'"
Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 150 n.3 
(1984) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). 
The plaintiff in the present case made clear in his complaint
the types of adverse action he was alleging (sham detail,
derogatory comments), and set forth the discriminatory basis
that he claimed for those actions (race, national origin,
age), in violation of Title VII and the ADEA. As for legal
theories, he then put his continuing hostile work environment
theory before the district court when the court considered
the defendant's motion for summary judgment (albeit in a
reply brief). That is sufficient to enable the plaintiff to
argue that theory on appeal. Cajigas v. Banco de Ponce, 741 
F.2d 464, 468 n.12 (1st Cir. 1984).

-25- 25

action to be judged each on its own merits." Vance v. 

Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1511 (11th Cir. 

1989). The Mills court therefore allowed the plaintiff to 

seek recovery of compensatory and punitive damages for any

post-Act conduct amounting to sexual harassment under Title

VII. Id.  

Although DeNovellis does not discuss them, other

courts have allowed Title VII claims for harassment other

than sexual harassment. See Lattimore, 99 F.3d at 463; 

Lindemann & Grossman, supra, at 749-54. Indeed, until recent 

years, one of the most common forms of harassment claim was

verbal abuse, such as racial epithets. See Lindemann & 

Grossman, supra, at 749-54. Harassment may also consist of 

pranks and other forms of hazing, even without racial slurs,

although, in such cases, "courts look especially closely to

see whether the conduct is in fact racially [or otherwise

invidiously] motivated." Id. at 753.  

Not all offensive conduct is actionable as

harassment; trivial offenses do not suffice. See Meritor 

Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986). The Court has 

ruled that, in order to establish a Title VII claim for

sexual harassment under a hostile environment theory, the

conduct must be "'sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an

abusive [or hostile] working environment.'" Harris v. 

-26- 26

Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Los 

Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 

n. 13 (1978)); see Vinson, 477 U.S. at 67; Carleton Woolen 

Mills, 108 F.3d at 439. 

In determining whether harassment on the job is

sufficiently severe or pervasive to rise to the level of a

Title VII violation, courts look to the gravity as well as

the frequency of the offensive conduct. See, e.g., Vance, 

863 F.2d at 1510-11 (noose hanging from light fixture above

employee's work station twice was sufficient to establish

harassment violation). Guidelines published by the Equal

Employment Opportunity Commission (EEOC) require that sexual

harassment be severe enough to alter the victim's workplace

experience (even if the conduct only occurs once), or

pervasive enough to become a defining condition of the

workplace. EEOC Policy Guidance on Sexual Harassment, 8 FEP

Man. at 405:6689; see Lindemann & Grossman, supra, at 794. 

Sexual harassment can be severe enough to be illegal even

without tangible effects on job performance or psychological

well-being. Harris, 510 U.S. at 22.  

DeNovellis's reliance on sexual harassment cases

such as Mills is misplaced because the situations are not 

analogous. Mills and other sexual harassment cases involve a 

pervasive and continuing hostile work environment, which

constitutes a continuing violation, akin to a systemic

-27- 27

(continuing practice) violation. In contrast, DeNovellis's

allegations of "purgatory" job assignments set forth, at

best, allegations as to discrete and independent employment

decisions, however adverse. Such claims are not pervasive

enough to be considered as one continuous imposition of

hostile work environment, analogous to sexual harassment.

Nor is a "purgatory" assignment sufficiently severe to

constitute, by itself, a hostile work environment. As

previously noted, the fact that DeNovellis remained assigned

to "purgatory" cannot constitute a post-Act violation, even

though the effects of that assignment decision were prolonged

into the post-Act period by the bureaucratic delays emanating

from the agency's reorganization. See Evans, 431 U.S. at 

558; see Part III.A., supra. 

DeNovellis correctly points out that the court must

focus on the work atmosphere as a whole, and not separate out

each demeaning work assignment or derogatory remark for

individual analysis. See Vance, 863 F.2d at 1510. 

Nevertheless, the question is whether he produced enough

evidence on the entire summary judgment record to enable a

reasonable trier of fact to find a cognizable hostile

environment claim. We agree with the district court that he

did not. 

Williams and others at HHS apparently made some

scattered comments that could be construed as evincing

-28- 28

racial, ethnic, or age-based hostility, although some of the

comments in the record were not made in DeNovellis's

presence. DeNovellis does not argue that these comments were

severe or pervasive, nor does he claim that they rise to the

level of sufficiency necessary to make out a prima facie case

of harassment. Rather, he appears to offer them as probative

of discriminatory motive underlying his job assignments.

The major aspect of his work environment that

DeNovellis claims was hostile or "harassing" was his so-

called "employment purgatory" of job assignments to positions

he considered to be unfit for his level of qualification. As

already noted, the "hostile" aspect of remaining in an

undesirable job assignment is not akin to a pervasive

environment claim; it is a discrete employment decision,

however adverse it may be. Even when this is combined with

the derogatory comments, we do not think a fact-finder, based

on this record, could reasonably conclude that DeNovellis's

work environment was so pervaded with racial, ethnic, or age

discrimination so as to constitute a violation of Title VII.

That DeNovellis would be left without a remedy if

we affirm the district court's decision is not a sufficient

reason to warrant reversal. The Court in Landgraf was not 

moved by petitioner's argument there that, "if she [could]

not obtain damages pursuant to [the 1991 Act], she [would] be

left remediless despite an adjudged violation of her right

-29- 29

under Title VII to be free of workplace discrimination." 511

U.S. at 285 n.38. As the Court put it, Title VII "did not

create a 'general right to sue' for employment

discrimination, but instead specified a set of 'circumscribed

remedies,'" and "[u]ntil the 1991 amendment, the Title VII

scheme did not allow for damages. We are not free to fashion

remedies that Congress has specifically chosen not to

extend." Id. (quoting United States v. Burke, 504 U.S. 229, 

240 (1992)). DeNovellis's lack of a remedy (even if there

were a violation) is a result of the way Congress had drafted

Title VII prior to the 1991 Act; whatever unfairness arose

from that limited remedial scheme affected all plaintiffs

suing under it. 

IV.

Exhaustion of Administrative Remedies 

DeNovellis argues that the district court erred in

dismissing his post-detail deprivation of duties and hostile

environment claims because he failed to exhaust his

administrative remedies. DeNovellis misconstrues the

district court's decision. The court did not grant summary

judgment against him based on his failure to exhaust

administrative remedies. With respect to the post-Act

deprivation of duties the district court stated that "a

strong argument" could be made that he has not exhausted his

Title VII claim, but the court did not decide the issue.

-30- 30

Moreover, with respect to his claim under the ADEA, the court

noted that the government had waived any exhaustion

argument.7 The district court decided the post-Act

deprivation of duties claim on the basis that DeNovellis

failed to produce evidence to support a claim of

discrimination, sufficient to withstand summary judgment.

The district court rejected DeNovellis's hostile

work environment claim based on the same reasoning as the

pre-Act deprivation of duties (a possible wrong but without a

remedy). The court added one sentence stating failure to

exhaust as an alternative ground for rejecting this claim,

but we need not address that here because we affirm based on

DeNovellis's failure to demonstrate a genuine issue as to a

severe or pervasive hostile environment. 

Thus, we need not reach DeNovellis's exhaustion

argument because we uphold the district court's summary

judgment ruling as to Title VII and the ADEA based on its

reasons other than exhaustion. 

 

7. The government takes the position that the ADEA does not
require a federal employee to exhaust his administrative
remedies. The Supreme Court has held, in the context of a
private employer, that "filing a timely charge of
discrimination with the EEOC is not a jurisdictional
prerequisite to suit in federal court, but a requirement
that, like a statute of limitations, is subject to waiver,
estoppel, and equitable tolling." Zipes v. Trans World 
Airlines, Inc., 455 U.S. 385, 393 (1982). Quite possibly 
Zipes should apply as well when a federal employee sues a 
federal agency, see Rennie v. Garrett, 896 F.2d 1057, 1059-60 
(7th Cir. 1990) (citing cases); but we need not decide the
point definitively in the present case.

-31- 31

-32- 32

V.

Declaratory Relief and Attorney's Fees 

Finally, DeNovellis argues that the district court

should have awarded him declaratory relief and attorney's

fees. His reasoning, however, is based on a false premise.

DeNovellis asserts that the district court 

ruled as a matter of law that DeNovellis'
"five-month assignment to a financial
position for which he had no background
was not only a set-up for failure but
also an adverse employment action"
motivated by illegal discrimination based
upon age, race or ethnicity.

The internal quotations accurately reproduce the district

court's conclusion as to the legal question of whether the

sham assignment constituted an adverse employment action

within the meaning of Title VII and the ADEA. DeNovellis's

assertion after the internal quotation, however,

misrepresents what the district court found. 

The court held that DeNovellis had presented

sufficient evidence on the intent issue to survive a summary

judgment motion as to his pre-Act deprivation of duties. The

court did not make a conclusive factual finding as to

discriminatory intent; that question would be resolved by the

trier of fact if the matter went to trial. The court granted

the Secretary's motion for summary judgment because the court

found that DeNovellis would not be entitled to a remedy even

if the case went to trial and he were able to persuade the

-33- 33

trier of fact that the defendant was motivated by a

discriminatory intent.

The difference between what the court actually held

and what DeNovellis claims it held is fatal to his argument

that the court was obligated to award him a declaratory

judgment and attorney's fees.8 If DeNovellis were correct in

his characterization of the posture of the case -- that the

district court had already made a factual finding of

discriminatory intent -- then the court would still have

discretion as to whether to grant declaratory relief after

finding discrimination at trial. But at least then

DeNovellis might be able to persuade us that the district

court abused its discretion in denying him declaratory relief

and fees. 

The Declaratory Judgment Act is "an enabling Act,

which confers a discretion on the courts rather than an

absolute right upon the litigant"; courts have broad

discretion to decline to enter a declaratory judgment.

Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995) (quoting 

Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241 

(1952)). "By the Declaratory Judgment Act, Congress sought

 

8. Although his complaint did not seek a declaratory
judgment, DeNovellis argues that the court had the authority
to award such relief under his final prayer for relief, which
sought "such other and further relief as may be just and
proper." He is correct on this point, but we reject his
declaratory judgment argument on other grounds.

-34- 34

to place a remedial arrow in the district court's quiver; it

created an opportunity, rather than a duty, to grant a new

form of relief to qualifying litigants. Consistent with the

nonobligatory nature of the remedy, a district court is

authorized, in the sound exercise of its discretion, . . . to

dismiss an action seeking a declaratory judgment before

trial." Wilton, 515 U.S. at 288. Although "federal courts 

have a 'virtually unflagging obligation' to exercise the

jurisdiction conferred on them by Congress," a district court

may "nonetheless abstain from the assumption of jurisdiction

over a suit in 'exceptional' circumstances" such as where a

declaratory judgment is sought regarding an issue currently

pending in a state court action. Wilton, 515 U.S. at 284 

(quoting Colorado River Water Conservation Dist. v. United 

States, 424 U.S. 800, 813, 817-18, 818-20 (1976)). "In the 

declaratory judgment context, the normal principle that

federal courts should adjudicate claims within their

jurisdiction yields to considerations of practicality and

wise judicial administration." Wilton, 515 U.S. at 288. But 

see Steffel v. Thompson, 415 U.S. 452, 468 (1974) ("'[A] 

federal district court has the duty to decide the

appropriateness and the merits of the declaratory request

irrespective of its conclusion as to the propriety of the

issuance of [a requested] injunction.'") (quoting Zwickler v. 

Koota, 389 U.S. 241, 254 (1967)); Frankfurter & Landis, The 

-35- 35

Business of the Supreme Court: A Study of the Federal 

Judicial System 65 (The federal courts are "the primary and 

powerful reliances for vindicating every right given by the

Constitution, the laws, and treaties of the United States.").

The standard of appellate review of a decision as

to declaratory relief is whether the district court abused

its discretion. Wilton, 515 U.S. at 289. Thus, if the 

district court actually found discriminatory intent in

DeNovellis's deprivation of duties, we might or might not

find that the denial of a declaration to that effect was an

abuse of discretion. Cf. Metropolitan Stevedore Co. v. 

Rambo, 117 S. Ct. 1953 (1997) (nominal damages permitted in 

Longshore and Harbor Workers' Compensation Act case in order

to preserve right to receive future benefits).

Because the district court found that the question

of discriminatory intent was a triable issue, without

reaching any conclusion as to whether such intent actually

existed, our review of its denial of declaratory relief is in

a different posture. The court faced the possibility of

conducting a trial in this case, assessing arguments and

counter-arguments as to what people intended by certain

statements or actions, with no opportunity to award any

relief to DeNovellis that would remedy the harm he allegedly

suffered. After trial, the court might possibly have the

authority to enter a declaration that some or all of the

-36- 36

defendant's now-terminated employment actions were

discriminatory. In the circumstances of this case, the

district court's decision -- prior to trial -- to refrain

from such a fruitless endeavor was within its discretionary

power. See Wilton, 515 U.S. at 288. 

Because DeNovellis has no entitlement to a

declaratory judgment and because we have affirmed the denial

of other relief, he has not prevailed on any issue in the

case and attorney's fees may not be awarded. See 42 U.S.C.  

1988; Texas State Teachers Ass'n v. Garland Indep. Sch. 

Dist., 489 U.S. 782, 791-92 (1989) (A litigant is a 

prevailing party if he "has succeeded on 'any significant

issue in litigation which achieve[d] some of the benefit the

parties sought in bringing suit.'") (alteration in original)

(quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir. 

1978)).

Conclusion 

Title VII and our other antidiscrimination laws

serve essential societal goals. See Aikens, 460 U.S. at 716. 

If America stands for anything in the world, it is fairness

to all, without regard to race, sex, ethnicity, age, or other

immutable characteristics that a person does not choose and

cannot change. We have recently had occasion to note that

"Title VII is one of the brightest stars in the firmament of

this nation's antidiscrimination laws." Serapion v. 

-37- 37

Martinez, F.3d , , 1997 WL 394605, at *2 (1st Cir. 

July 18, 1997). 

The standards for summary judgment are highly

favorable to the party opposing such a motion, and issues of

motive often present fair factual disputes properly resolved

by a factfinder after trial. Nevertheless, in this instance

the dearth of evidence is simply too great and summary

judgment was properly granted.

The judgment of the district court is Affirmed. Affirmed 

-38- 38