**WATER KEEPER ALLIANCE, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF DEFENSE, et al., Defendants.**

**Civil No. 00–2295(HL).**

United States District Court, D. Puerto Rico.

July 17, 2001.

Celina Romany Siaca, Maria L. Jiminez–Colon, Jose Pagan–Nieves, San Juan, PR, for plaintiffs.

Isabel Munoz–Acosta, U.S. Attorney's Office, District of P.R., Civil Division, Hato Rey, PR, Wayne D. Hettenbach, Eileen T. McDonough, Marc Swartz, Washington, DC, for defendants.

Miguel A. Fernandez–Torres, U.S. Attorney's Office, District of P.R., Civil Division, Hato Rey, PR, for Donald H. Rumsfeld, Robert B. Pirie and Gail Norton.

## OPINION AND ORDER

LAFFITTE, Chief Judge.

This lawsuit presents claims under the Resource Conservation and Recovery Act

("RCRA"), claims under the Endangered Species Act ("ESA") for violation of certain "consultation requirements," claims under the ESA for "illegal takings" of listed species, and claims for denial of equal protection of the laws. Defendants have filed a Motion to Dismiss, Dkt. No. 55; Plaintiffs have filed an opposition, Dkt. No. 63; Defendants have filed a reply, Dkt. No. 72; and Plaintiffs have filed a sur-reply, Dkt. No. 83. For reasons that follow, the Court hereby grants Defendants' Motion to Dismiss.

### Discussion [1]

In their motion to dismiss, Defendants request the partial dismissal of Plaintiffs' RCRA claims, complete dismissal of Plaintiffs' equal protection claims, and complete dismissal of Plaintiffs' ESA claims.

### 1. RCRA Claims

The parties agree that RCRA allows any person to file suit "against any person, including the United States ..., who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or *disposal of any solid or hazardous waste* which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). The parties further agree that for Plaintiffs to succeed on their RCRA claims, they must demonstrate that Defendants are disposing of, or have disposed of, solid waste in Vieques.[2]

### a. Fired Ordnance as "Solid Waste" Under RCRA

█ Plaintiffs argue that as soon as ordnance is fired and makes contact with the land in the Live Impact Area ("LIA"), it becomes solid waste, and the Defendants have disposed of it. Both "solid waste" and "disposal" are statutorily-defined terms. Solid waste is

any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other *discarded* material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities.

42 U.S.C. § 6903(27) (emphasis added). Disposal is

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste ... into or on any land or water so that such solid waste ... or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

Defendants argue that disposal requires placing onto land of solid waste and that solid waste must be "discarded material" under the statute. Plaintiffs do not dispute this position. Thus, the parties' disagreement can be distilled to the following: whether as soon as ordnance is fired and makes contact with the land it is "discarded material." If it is not discarded material, it is not solid waste, and Plaintiffs can not bring suit on the basis of the firing of ordnance in the LIA under RCRA's citizen suit provision.

Defendants contend that ordnance is not discarded material as soon as it is fired onto the LIA. The essence of Defendants'

---

1. A lengthy recitation of the procedural history of this case appears in the Court's Opinion and Order of June 12, 2001. *See* Dkt. No. 74.

2. Because the parties agree that "hazardous waste" is a subset of "solid waste," the Court shall refer only to "solid waste" in discussing Plaintiffs' RCRA claims.

argument is that the firing of munitions and their subsequent contact with the LIA are precisely the intended use of the munitions. In other words,

> [t]he very purpose of the ordnance in the training exercises at issue is to be fired from a plane or ship and to hit the ground, either to explode or to raise dust, depending on whether it is live or inert, so that the observers can evaluate the accuracy of the pilot or gunner.

Dkt. No. 55. Thus, Defendants are not discarding ordnance when they fire it at the LIA.[3]

In support of this asseveration, Defendants cite *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305 (2nd Cir.1993), for the proposition that ordnance does not become discarded material until some time after it has served its intended purpose. Plaintiffs agree with Defendants that the Second Circuit's decision was based in large part on the Environmental Protection Agency's ("EPA") *amicus curiae* argument that munitions "eventually" become discarded material by being "left to accumulate long after they have served their intended purpose." Dkt. No. 73. Plaintiffs point out, however, that "[s]ince it was uncontroverted that the fired ordnance would remain on the ground without immediate remediation the Court stated that it need not decide whether the ordnance was discard-

ed as soon as the shot was fired, or at some other point." Dkt. No. 63.

Plaintiffs argue that this means that ordnance becomes discarded material as soon as it is fired. The Second Circuit's decision in *Connecticut Coastal Fishermen's Ass'n*, however, points to precisely the opposite conclusion. The court stated,

> [w]ithout deciding how long materials must accumulate before they become discarded—that is, when the shot is fired or at some later time—we agree that the lead shot and clay targets in Long Island Sound have accumulated long enough to be considered solid waste.

*Connecticut Coastal Fishermen's Ass'n*, 989 F.2d at 1316.[4] Thus, the court's language strongly suggests that munitions must "accumulate" for an unspecified amount of time before they can be considered discarded material and thus solid waste.

■ Defendants next cite the EPA-promulgated Military Munitions Rule ("MMR") for the proposition that firing ordnance on an active military training range "is the use of a product for its intended purpose and is not the discarding of waste material." Dkt. No. 55.[5] Plaintiffs argue that the MMR is of no use in interpreting the meaning of discarded material because the MMR only defines "when military munitions become hazard-

---

**3.** Defendants point out that they "do not seek dismissal of any claim that ordnance debris and unexploded ordnance *left to accumulate* on the LIA constitute solid waste." Dkt. No. 72. Consequently, the Court will not dismiss this claim.

**4.** Plaintiffs argue also that the Second Circuit was dealing with the narrower regulatory definition of solid waste, rather than the broader statutory definition of solid waste. The statutory definition is the one that applies to RCRA citizen suits. Plaintiffs' make much ado about nothing, however, because the Second

Circuit interpreted the meaning of *discarded material*, an integral part of both the regulatory and statutory definitions of solid waste.

The parties agree that the regulatory definition of solid waste simply adds to the statutory definition the requirement that the discarded material also be "abandoned."

**5.** The EPA's conclusions regarding the interpretation of RCRA are entitled to deference. *See* Dkt. No. 55 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

ous waste for purposes of [Subtitle C]," which uses the narrower regulatory definition of solid waste. *See Military Toxics Project v. E.P.A.,* 146 F.3d. 948, 951 (D.C.Cir.1998). The instant case, on the other hand, is brought under the citizen-suit provision of Subtitle G, which uses the broader and more plaintiff-friendly statutory definition of solid waste.

Defendants acknowledge that the MMR relies on the regulatory, rather than the statutory, definition of solid waste. They correctly point out, though, that both definitions contain the term discarded material. Thus, any definition of discarded material, even if provided by the MMR, is instructive. Contrary to Plaintiffs' assertion that ordnance becomes discarded material as soon as it is fired, the District of Columbia Circuit's exegesis of the MMR makes clear that "the use of munitions does not constitute a waste management activity because the munitions are not 'discarded.'" *Military Toxics Project,* 146 F.3d at 952 (citations omitted).

Finally, Defendants cite *No Spray Coalition, Inc. v. City of New York,* 2000 WL 1401458 (S.D.N.Y.2000), in support of their position that munitions do not become discarded material upon being fired. In that case, the plaintiffs used RCRA to challenge the City of New York's spraying of insecticides to kill mosquitos to halt the spread of the West Nile Virus. The Southern District held that

> it would contort the statutory language and do violence to the intent of Congress in enacting RCRA to hold that pesticide that has been sprayed but has yet to reach the mosquitos or their habitats is "discarded material." The very Second Circuit Court of Appeals case that Plaintiffs cite, *Connecticut Coastal Fishermen's Association v. Remington Arms Co.,* 989 F.2d 1305, 1316 (2d Cir.1993), indicates that material is not discarded

until after it has served its intended purpose. Here, the intended purpose of the spray is to drift through the air until coming to rest on the mosquitos and their habitats. Thus, it cannot be said that the insecticide is discarded when it is sprayed, and Plaintiffs' claims under RCRA are dismissed.

*No Spray Coalition,* 2000 WL 1401458 at 4. In their opposition, Plaintiffs' make no attempt to distinguish the facts in *No Spray Coalition* from the facts in the instant case. The Southern District's analysis persuasively supports the notion that neither insecticide nor munitions become discarded at the time of their release; rather, they can not be considered discarded until some time after they have served their intended purpose.

Undaunted, Plaintiffs present an alternative argument in support of their contention that ordnance becomes discarded material immediately upon being discharged. They assert that even if ordnance does not become discarded material until after it has served its intended purpose, the ordnance being used in the LIA is not serving its intended purpose. Thus, the argument goes, the ordnance is discarded material as soon as it is fired.

Defendants assert that the intended use of their munitions is "is to be fired from a plane or ship and to hit the ground, either to explode or to raise dust, depending on whether [they are] live or inert, so that the observers can evaluate the accuracy of the pilot or gunner." Dkt. No. 55. Plaintiffs counter that because inert bombs sometimes "skip" off of the range and into the water, Defendants' munitions are not being used for their intended purpose.

Simply because some ordnance fails to fulfill its purpose of landing on the LIA and raising a dust cloud can not, as Plaintiffs would have it, mean that the ordnance is discarded material immediately upon be-

ing fired. Regardless of whether the ordnance performs as the gunner or bomber wishes, it is most certainly being used for its intended purpose and is thus not discarded material under RCRA. To hold otherwise would torture the meaning of the term discarded material.

Further, if Plaintiffs' contention were taken to its logical conclusion, every piece of ordnance that did not land precisely where it was intended would be considered discarded material immediately upon being fired. Further, a court faced with the facts in *Connecticut Coastal Fishermen's Ass'n*, in which shotguns were used to shoot lead pellets at clay targets, would have to differentiate between the lead pellets that actually hit the targets and those that did not in determining which lead pellets were discarded material under RCRA. A court dealing with the spraying of insecticides, as in *No Spray Coalition*, would have to determine which airborne droplets of insecticide actually made contact with and killed mosquitos and which did not. Taken further, the court would have to determine whether the mosquitos killed were actually carriers of the West Nile Virus, in determining whether the droplets were being used for their intended purpose. This extreme result can not have been within Congress' contemplation in drafting RCRA.

Thus, RCRA does not support Plaintiffs' contention that munitions become discarded material immediately upon being fired. Not being discarded material, these munitions can not be considered solid waste. Accordingly, the Court hereby dismisses Plaintiffs' claim that Defendants' firing of ordnance onto the LIA constitutes "*dispos-*

*al of any solid or hazardous waste* which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (emphasis added).[6]

### b. Discharges of Ordnance that are Authorized by NPDES Permit

■ Defendants argue in their Motion to Dismiss that any claimed discharges of solid waste that are covered by Defendants' National Pollution Discharge Elimination System ("NPDES") permit are not properly the subject of Plaintiffs' RCRA suit.[7] Thus, Plaintiffs' claims should be dismissed to the extent that they are based on discharges of solid waste that are covered by Defendants' NPDES permit.

The parties agree that RCRA's definition of solid waste *excludes* "industrial discharges which are point sources subject to permits under [section 402 of the Clean Water Act, 33 U.S.C. § 1342]" and that this exclusion was included in RCRA to prevent duplicative regulation under RCRA and the Clean Water Act. *See Inland Steel Co. v. EPA*, 901 F.2d 1419, 1423 (7th Cir.1990). Further, the parties agree that Defendants have a valid NPDES permit and that they have had that permit since 1984.

Plaintiffs only contend that Defendants' NPDES permit does not apply to discharges of solid waste that took place before 1984 and that the permit does not apply to the discharge of solid waste "into the soils and groundwater of Vieques, and the subsequent runoff of these contaminants into the surrounding waters, nor does it include the airborne, contaminated dust particles that result from the bomb-

---

**6.** Once again, Defendants point out that they "do not seek dismissal of any claim that ordnance debris and unexploded ordnance *left to accumulate* on the LIA constitute solid

waste." Dkt. No. 72. Consequently, the Court will not dismiss this claim.

**7.** An NPDES permit is issued under section 402 of the Clean Water Act, 33 U.S.C. § 1342.

ing." Dkt. No. 63. Defendants do not dispute Plaintiffs; rather, Defendants point out that any factual arguments over the timing and nature of Defendants' discharges are not properly considered on a motion to dismiss.

Thus, it appears that the parties are in complete agreement with regard to Defendants' NPDES-permit argument. Accordingly, Plaintiffs' RCRA claims are hereby dismissed only to the extent that they rely on discharges of solid waste that are covered by Defendants' NPDES permit.

### c. RCRA's Coverage of Depleted Uranium

■ In their Motion to Dismiss, Defendants assert that RCRA "expressly excludes from the definition of solid waste 'source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954.'" Dkt. No. 55 (citing 42 U.S.C. § 6903(27)). The Atomic Energy Act defines "source material" as including uranium. *See* 42 U.S.C. § 2014(z). Finally, regulations promulgated by the Nuclear Regulatory Commission define depleted uranium as source material. *See* 10 C.F.R. § 40.4 (2001).

Plaintiffs completely fail to address this argument in their opposition. Thus, RCRA's definition of solid waste expressly excluding depleted uranium, Plaintiffs' RCRA claims are hereby dismissed to the extent that they rely on Defendants' discharges of depleted uranium.

### 2. Equal Protection Claims

Plaintiffs bring claims for denial of the equal protection of the laws under the Fifth Amendment to the United States Constitution. Plaintiffs state,

Defendant's [*sic*] violated this equal protection mandate when, without compelling justification, they chose to inflict military exercises and the resulting devastating consequences on the Viequenses because of their race and national origin, demonstrating a clear disregard for their well-being compared to the well-being of non-Viequenses.

Dkt. No. 41. In their Memorandum in Response to the Court's Order to Show Cause, Dkt. No. 42, Plaintiffs assert that their "claim falls within the waiver of sovereign immunity contained in 5 U.S.C. § 702 and is therefore not barred by the doctrine of sovereign immunity." Section 702 is part of the Administrative Procedure Act ("APA") and provides in part,

[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. Defendants move to dismiss these claims as time-barred.[8] Plaintiffs counter by claiming the existence of both serial and systemic continuing violations.

■ The applicable limitations period for claims brought under 5 U.S.C. § 702 is "the general six-year statute of limitations applicable to civil actions against the United States." 14A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3659 (3d ed.1998) (citing 28 U.S.C. § 2401(a)). Further, in suits brought under the APA, a

---

**8.** The Court notes that on January 16, 2001, the Court ordered Plaintiffs to show cause why their claim of discriminatory siting of Camp Garcia should not be dismissed as time-barred. Dkt. No. 35.

"cause of action ... first accrues, within the meaning of § 2401(a), as soon as ... the person challenging the agency action can institute and maintain a suit in court." *Trafalgar Capital Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir.1998) (internal quotations omitted).

In this case, neither side disputes that Plaintiffs knew or had reason to know of their alleged injury well before October 10, 1994, the date six years before the filing of this lawsuit. Further, neither side disputes that Camp Garcia was constructed in Vieques in the 1940s and that training exercises commenced there long before October 10, 1994. Thus, the six-year statute of limitations requires the Court to find that Plaintiffs' equal protection claims are time-barred *at least* insofar as they are based on the construction of Camp Garcia and training exercises conducted prior to October 10, 1994.

■ Although some of Plaintiffs' alleged injury is presumably the result of training exercises conducted after October 10, 1994, Defendants argue that these training exercises are merely the "continuing effects" of Defendants' now time-barred acts and thus are not actionable as violations. *See De-Novellis v. Shalala*, 124 F.3d 298, 309–10 (1st Cir.1997). *See also Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). Defendants' argument is based on the proposition that "plaintiffs are really complaining of the effects stemming from the original decision in the 1940's, to site a military base on Vieques." Dkt. No. 55. Plaintiffs counter that Defendants' training exercises each constitute a separate violation and are not merely continuing effects of the original construction of Camp Garcia in Vieques.

The Court finds that Plaintiffs' have properly alleged that each of Defendants' training exercises is a separate violation of Plaintiffs' right to equal protection of the laws for statute-of-limitations purposes. In their Amended Complaint, Plaintiffs assert that Defendants have denied them the equal protection of the laws by "needlessly sit[ing] and maintaining [Camp Garcia] on Vieques [and] recklessly conduct[ing] thousands of bombing raids ...." Dkt. No. 41. Plaintiffs' claims are not simply confined to the original decision in the 1940's to site a military base on Vieques. Thus, Plaintiffs' equal protection claims are only time-barred insofar as they are based on the construction of Camp Garcia and training exercises conducted prior to October 10, 1994.

■ The equitable doctrine of continuing violations can in some cases temper the effects of the statute of limitations. The First Circuit has clearly set forth the doctrine of continuing violations:

> This court has recognized two branches of the continuing violation doctrine: serial violations and systemic violations. *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 869 (1st Cir .1997). Serial violations are described as 'compris[ing] a number of discriminatory acts emanating from the same discriminatory animus, each of which constitutes a separate wrong ....' *Id.* (internal quotation marks omitted). The series must contain a discriminatory act occurring within the limitations period for the plaintiff to reach back to include those otherwise untimely acts in [the] claim. *See Provencher v. CVS Pharmacy,* 145 F.3d 5, 14 (1st Cir.1998). In contrast, a systemic violation 'requires no identifiable act of discrimination in the limitations period and refers to general practices or policies ....' *Id.* If the 'policy or practice itself continues into the limitations period,' a plaintiff will be 'deemed to have filed a timely complaint' under the systemic continuing violation theory.

*Megwinoff v. Banco Bilbao Vizcaya*, 233 F.3d 73, 74–75 (1st Cir.2000).

■ Plaintiffs rely on both the doctrines of serial and systemic violations, but neither doctrine saves Plaintiffs' equal protection claims from being dismissed as time-barred insofar as they are based on the construction of Camp Garcia and training exercises conducted prior to October 10, 1994. There is no doubt but that a continuing violation—whether systemic or serial—will fail "[e]ven where a plaintiff alleges a violation within the appropriate statute of limitations period, ... if the plaintiff was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place." *Provencher*, 145 F.3d at 14; *Sabree v. United Bhd. of Carpenters and Joiners Local No. 33*, 921 F.2d 396, 400–02 & n. 7 (1st Cir.1990).

There is simply no dispute between the parties that Plaintiffs knew or *at least should have known* that they were allegedly being discriminated against at the time that the allegedly discriminatory acts were taking place. Plaintiffs have not argued that they had reason to be unaware of the alleged discrimination to which Defendants have subjected them via the construction of Camp Garcia and the conduct of training exercises. Thus, the doctrine of continuing violations does not save from dismissal Plaintiffs' equal protection claims insofar as they are based on the construction of Camp Garcia and training exercises conducted prior to October 10, 1994.[9]

**3. ESA Claims**

■ Finally, Defendants seek dismissal of Plaintiffs' claims under the ESA on the ground that Plaintiffs

failed to give adequate notice of their claims prior to commencing this action. The May 16, 2000 notice of intent to sue does not include the claims upon which the plaintiffs have sought relief in their Complaint, and the plaintiffs' causes of action should therefore be dismissed because this court lacks jurisdiction.

Dkt. No. 55. The parties agree that the ESA requires written notice to the Secretary of Commerce and/or Interior and any alleged violator at least sixty days prior to the filing of a citizen suit. *See* 16 U.S.C. § 1540(g)(2)(A). Further, there is no dispute that failure to comply with the ESA's notice requirement divests the Court of jurisdiction to entertain claims under the ESA. *See, e.g., American Rivers v. Nat'l Marine Fisheries Service*, 126 F.3d 1118, 1124 (9th Cir.1997); *Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir.1988). Finally, the ESA's notice requirement is to be strictly construed. *See Hallstrom v. Tillamook County*, 493 U.S. 20, 26, 31, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) (pointing out that RCRA's 60–day notice requirement is a "mandatory condition[ ] precedent to commencing suit" that can not be avoided by equitable, "flexible," or "pragmatic" considerations).[10] Courts have recognized the policy justification for the sixty-day notice requirement:

The purpose of the 60–day notice provision is to put the agencies on notice of a

9. Defendants also move to dismiss Plaintiffs' claims based on the equitable doctrine of laches. The Court's disposition of Defendants' statute-of-limitations argument, however, obviates the laches inquiry.

10. Courts routinely rely on the Supreme Court's interpretation of RCRA's sixty-day notice provision in interpreting the ESA's sixty-

day notice provision. *See, e.g., Southwest Center for Biological Diversity v. United States Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir.1998); *Save the Yaak Comm.*, 840 F.2d at 721, *Lone Rock Timber Co. v. United States Dep't of Interior*, 842 F.Supp. 433, 440 (D.Or.1994).

perceived violation of the statute and an intent to sue. When given notice, the agencies have an opportunity to review their actions and take corrective measures if warranted. The provision therefore provides an opportunity for settlement or other resolution of a dispute without litigation.

*Southwest Center,* 143 F.3d 515, 520 (9th Cir.1998) (internal quotations and citations omitted).

The parties agree that Plaintiffs notified their intent to sue at least sixty days prior to the filing of this suit. Defendants allege, however, that Plaintiffs "failed to give adequate notice of their claims" because the "May 16, 2000 notice of intent to sue does not include the claims upon which the plaintiffs have sought relief in their Complaint." Thus, Defendants contend, Plaintiffs should have filed a new notice of intent to sue that properly included the claims brought in Plaintiffs' Amended Complaint. Plaintiffs' May 16, 2000, notice of intent to sue reads in part,

> [t]he Navy does not currently have, nor has it applied for an incidental permit to lawfully "take" any of these creatures [hawksbill sea turtle, leatherback sea turtle, West Indian manatee, and brown pelican]. Nor has the Navy been granted an exemption pursuant to § 7(h) or § 7(j). Therefore, Defendants are in violation of § 9 of the ESA. 16 U.S.C. § 1538.

Dkt. No. 55, Exhibit A. The notice goes on to state,

> [s]ince this 1981 biological assessment, scientists have compiled new information indicating that the Navy's activities may be destroying individuals and injuring their chances for survival. The Navy has refused to re-initiate the § 7 consultation with [Fish and Wildlife Service ("FWS")] and [National Marine Fisheries Service ("NMFS")]. In 1995 USFWS

formally requested that the Navy reinitiate § 7 consultation, the Navy refused. In January of 1998 the NMFS requested that the Navy reinitiate § 7 consultation, The [*sic*] Navy refused. By these actions the Navy has violated § 7(a)(1), § 7(a)(2) and § 7(c)(1) of ESA. 16 U.S.C. § 1536(a)(1) & (2) and 16 U.S.C. § 1536(c)(1).

*Id.*

Plaintiffs' Amended Complaint, on the other hand, states in part that

> [t]he Navy has been operating on Vieques under the terms of a 1980 biological opinion from FWS and a 1981 biological opinion from NMFS .... On July 27, 2000 FWS issued a biological opinion, and an accompanying incidental take statement, without the benefit of a biological assessment .... This biological opinion claims that it is the result of an "interim formal consultation," a consultation process that is not referenced in either the applicable statutory or regulatory framework .... The biological opinion is also in violation of ESA § 7(a)(2) in that it fails to "use the best available scientific and commercial data available ...." [Further, Defendants have continued to irretrievably commit resources to the agency action based on the faulty biological opinion, which has the effect of foreclosing reasonable alternative measures]. Defendants are also in violation of ESA § 7(a)(2) in that they have failed to [engage in consultations to] "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species ...." The Navy's activities on and around Vieques have resulted in the death of endangered and threatened species in violation of ESA § 9, which prohibits the illegal taking of such species [and the Navy

does not have a valid incidental take statement].

Dkt. No. 41, pp. 16–17 & 26.

Between the time of Plaintiffs' notice of intent to sue and Plaintiffs' Amended Complaint, the Navy was engaged in consultations with the FWS and the NMFS and received in July of 2000 a new biological opinion and incidental take statement. For this reason, Defendants argue, Plaintiffs' May 16, 2000 notice of intent to sue, which was based on the Navy's use of 1980 and 1981 biological opinions, is inadequate, and the Court lacks jurisdiction over Plaintiffs' ESA claims.[11]

In their submissions to the Court, the parties argue the import of a handful of cases on this topic. The Court shall address these cases and the parties' interpretations of their holdings in turn. In *Lone Rock Timber Co. v. United States Dep't of Interior*, 842 F.Supp. 433 (D.Or.1994), the plaintiffs sought an injunction to force the FWS to issue biological opinions. Subsequently, the FWS issued the biological opinions. In response, the plaintiffs filed an amended complaint in which they attacked the substance of the newly-issued biological opinions. The District Court held that the claims for an injunction to compel the issuance of the biological opinions were mooted by the issuance of those opinions.

Mootness is not an issue in the instant case, because Plaintiffs' Amended Complaint challenges the current July, 2000 biological opinion and incidental take statement. More relevant to the instant case, however, the *Lone Rock Timber* court held that the plaintiffs' notice of intent to sue was inadequate to support the claims presented in their amended complaint.

Whereas their notice discussed the FWS' failure to issue timely the biological opinions, their amended complaint attacked the substance of those opinions. Thus, the District Court dismissed these claims without prejudice in light of the requirement of a new notice of intent to sue.

Next, in *American Rivers v. Nat'l Marine Fisheries Service*, 126 F.3d 1118 (9th Cir.1997), the plaintiffs filed suit against the NMFS, among others, challenging a biological opinion as violative of § 7(a)(2) of the ESA. While the suit was pending, the NMFS issued a new biological opinion which superseded the previous one. *Id.* at 1123. The Ninth Circuit concluded that the issuance of the new biological opinion mooted the challenge to the previous biological opinion. *Id.* at 1124. Significantly, the Ninth Circuit did not base its decision on an examination of the adequacy of the new biological opinion and instead held that the plaintiffs had plenty of time to challenge any defects that they might find in the new biological opinion. *Id.*

The Ninth Circuit addressed only the mootness of the plaintiffs' complaint and did not address the adequacy of the plaintiffs' notice of intent to sue. This is because the suit was a challenge to the adequacy of a biological opinion brought against the Secretary of the Interior under the Administrative Procedure Act, 5 U.S.C. § 706, which has no sixty-day notice requirement. *American Rivers*, 126 F.3d at 1124. The Ninth Circuit's decision, however, is informative in the instant case because the court found the plaintiffs' complaint to be moot while still recognizing the possibility that the newly-issued biological opinion would be similarly objec-

---

**11.** The Court emphasizes that in ruling on the adequacy of Plaintiffs' notice of intent to sue, the Court need not decide, and in fact expressly refrains from deciding, the merits of Plaintiffs' claims of consultation violations and illegal takings as presented in their Amended Complaint.

tionable to the plaintiffs. The Ninth Circuit pointed out the plaintiffs' ability to bring a new challenge to the newly-issued biological opinion, rather than allowing the plaintiffs to continue with their initial lawsuit.

The parties also dispute the meaning of the Ninth Circuit's decision in *Southwest Center for Biological Diversity v. United States Bureau of Reclamation*, 143 F.3d 515 (9th Cir.1998). Defendants cite this case as an example of a court finding that a plaintiff's notice of intent to sue was inadequate in light of the fact that a biological opinion was issued after suit was filed. Plaintiffs assert that this decision is inapposite to the instant case because in *Southwest Center* the plaintiffs' notice of intent to sue discussed an entirely different claim from the one presented in their complaint.[12] The Court agrees with Plaintiffs that *Southwest Center*'s facts are distinguishable from those in the instant case. *Southwest Center* helps neither Plaintiffs nor Defendants in the instant case. Here, Plaintiffs' notice of intent to sue and their Amended Complaint contain nearly identical claims, but the notice is based on the Navy's use of 1980 and 1981 biological opinions, and the Amended Complaint is based on the July, 2000 biological opinion and incidental take statement.

Finally, the parties lock horns over the applicability of *Greenpeace v. Nat'l Marine Fisheries Service*, 80 F.Supp.2d 1137 (W.D.Wa.2000), to the instant case. Plaintiffs cite *Greenpeace* for the proposition that they can "continue to allege ESA § 7 violations against the acting agency in spite of the issuance of the [new] biological opinion." Dkt. No. 63. Defendants respond that *Greenpeace* does not address Defendants' contention that Plaintiffs must go back and "give adequate notice" before they can sue on the basis of the newly-issued biological opinion from July, 2000.

As in *American Rivers*, the issue in *Greenpeace* is mootness, not the adequacy of a notice of intent to sue. In *Greenpeace*, the District Court found that NMFS' attempt to "take back" its challenged biological opinion did not moot the plaintiffs' claim. *Greenpeace*, 80 F.Supp.2d at 1152. The District Court reasoned that if it found that NMFS's attempt at taking back the biological opinion had no effect, the original, challenged biological opinion would still be in place and susceptible to the plaintiffs' suit. If the court found, on the other hand, that NMFS had successfully revoked the biological opinion, there would be no biological opinion at all in place, constituting a clear violation of the ESA. The District Court went on to conclude that "until such time as a comprehensive opinion is in place, this Court retains the authority to determine whether [there is a violation of the ESA]."

In the instant case, however, just such a comprehensive opinion is in place. Plaintiffs' claims are not mooted by the newly-issued biological opinion because their Amended Complaint is based upon the July, 2000 biological opinion. The issue in this case is whether Plaintiffs' notice of intent to sue is adequate to support the claims in their Amended Complaint. Thus, *Greenpeace* provides no support for either side's contentions.

Of all the cited cases, only *Lone Rock Timber* discusses the adequacy of a plain-

---

12. In *Southwest Center*, the three letters that constituted the plaintiffs' notice of intent to sue failed even to mention the claim that the plaintiffs eventually put in their complaint: That the Bureau of Reclamation's operations at Lake Mead were in violation of the ESA by putting in jeopardy the survival of the Flycatcher and by taking Flycatchers without a valid incidental take statement.

tiff's notice of intent to sue in the wake of a newly-issued biological opinion. There, the District Court concluded that it lacked jurisdiction because of the inadequacy of the plaintiffs' initial notice and dismissed the suit without prejudice in light of the requirement of a new notice of intent to sue.

Plaintiffs attempt to distinguish *Lone Rock Timber* by arguing that in the instant case there are no "substantive discrepancies" between their notice of intent to sue and their Amended Complaint. They point out that their notice, although based on the Navy's use of 1980 and 1981 biological opinions, discusses consultation violations, including a faulty biological opinion, illegal takings of endangered species, and the like. Their Amended Complaint raises the same issues, even though it is based on the Navy's use of the July, 2000 biological opinion and incidental take statement.

The thrust of Defendants' argument, however, is not parried by Plaintiffs' no-substantive-discrepancies contention. Plaintiffs' analysis does not prevent the conclusion that this Court is divested of jurisdiction by Plaintiffs' failure to provide a new notice of intent to sue based on the July, 2000 biological opinion and incidental take statement. Further, the Ninth Circuit's decision in *American Rivers*, while not directly on point, provides useful guidance. In *American Rivers*, the Ninth Circuit based its dismissal of the plaintiffs' challenge to an existing biological opinion not on the adequacy of the newly-issued biological opinion, but rather only on the fact of the issuance of the new biological opinion. Further, the court found the plaintiffs' complaint to be moot while still

recognizing the possibility that the newly-issued biological opinion would be similarly objectionable to the plaintiffs. The Ninth Circuit pointed out the plaintiffs' ability to bring a new challenge to the newly-issued biological opinion, rather than allowing the plaintiffs to continue with their initial lawsuit.[13]

■ The holding in *Lone Rock*, and to a lesser extent the holding in *American Rivers*, lead the Court to conclude that Plaintiffs' notice of intent to sue can not support the claims brought in their Amended Complaint. Further, the Court reiterates that the ESA's notice requirement is to be strictly construed. *See Hallstrom*, 493 U.S. at 26, 31, 110 S.Ct. 304 (pointing out that the 60–day notice requirement is a "mandatory condition[ ] precedent to commencing suit" that can not be avoided by equitable, "flexible," or "pragmatic" considerations).

■ Finally, the fact that Plaintiffs' claims are for injunctive relief to stop Defendants from illegally operating without a proper biological opinion and without an incidental take statement (which Defendants now have as of July, 2000) is the most convincing argument for requiring Plaintiffs to address in a new notice of intent to sue the existence of a new biological opinion and incidental take statement as of July, 2000. Although the allegations in the existing notice of intent to sue and the Amended Complaint are similar, the notice of intent to sue is based on the Navy's use of 1980 and 1981 biological opinions, and the Amended Complaint is based on the Navy's use of the July, 2000

---

13. The Court emphasizes once again that in ruling on the adequacy of Plaintiffs' notice of intent to sue, the Court need not decide, and in fact expressly refrains from deciding, the merits of Plaintiffs' claims of consultation violations and illegal takings as presented in their Amended Complaint.

biological opinion and incidental take statement.[14] These are simply different claims, and this Court is without jurisdiction to adjudicate claims that are not preceded by proper notice under the ESA. Thus, the Court hereby dismisses without prejudice Plaintiffs' claims under the ESA.

WHEREFORE, the Court hereby dismisses **with prejudice**:

1) Plaintiffs' RCRA claims that Defendants' firing of ordnance onto the LIA constitutes "disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

2) Plaintiffs' RCRA claims to the extent that they rely on discharges of solid waste that are covered by Defendants' NPDES permit.

3) Plaintiffs' RCRA claims to the extent that they rely on Defendants' discharges of depleted uranium.

4) Plaintiffs' equal protection claims insofar as they are based on the construction of Camp Garcia and training exercises conducted prior to October 10, 1994.

The Court hereby dismisses without prejudice Plaintiffs' claims under the ESA.

Still remaining in this case are Plaintiffs' RCRA claims to extent that they are based on ordnance debris and unexploded ordnance left to accumulate on the LIA. In addition, Plaintiffs' equal protection claims remain pending to the extent that they are based on training exercises conducted on or after October 10, 1994.

**14.** The Court does not address Plaintiffs' assertion that "the Navy coerced FWS into illegally issuing a sham biological opinion." On a motion to dismiss, the court is not obliged

Defendants are granted until August 3, 2001 to file their answer to the Amended Complaint.

IT IS SO ORDERED.

to accept "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996).